UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CAROL TRAVIS                                                   PLAINTIFF

v.                                                        CIVIL ACTION NO. 3:11-CV-587

DEMING, MALONE, LIVESAY &
OSTROFF, P.S.C.                                                  DEFENDANT

**MEMORANDUM OPINION**

Carol Travis brings this action against her former employer, Deming, Malone, Livesay & Ostroff, P.S.C. ("DMLO"). Travis brings claims for violation of the Family Medical Leave Act ("FMLA"), the Age Discrimination in Employment Act ("ADEA"), and the Kentucky Civil Rights Act ("KCRA"). DMLO has moved for summary judgment as to each of those claims (DN 22). For the reasons stated herein, the motion will be granted.

**I.**

Travis began working for DMLO, an accounting firm, in 2003, when Travis was 63 years old. Travis was hired to work as an accountant in the General Services Department of DMLO. As such, Travis would be assigned by the supervisor of the General Services Department to work on client accounts that were overseen by one of the firm's "directors," who were the owners of the firm. From the time Travis was hired in 2003 until January of 2009, Cindy Hayes was the supervisor of the General Services Department; in January of 2009, Debbie Boyle took over as supervisor.

Travis was evaluated yearly at DMLO by directors that were familiar with her work. Each director ranked Travis in numerous performance categories. The possible rankings an employee

could receive in each category were "superior," "good," "competent," "marginal," or "unacceptable." Each director also gave Travis an overall performance ranking and provided specific comments about her performance. Travis's first evaluation at DMLO was in 2004, covering the time period ending in July of 2004. In that 2004 evaluation, Travis received 15 "superior" scores, 11 "good" scores, and 1 "competent" score. Her overall performance was rated "superior," and the only criticisms noted in her performance review were that she had made some careless mistakes and was still learning DMLO's procedures.

Travis's 2005 evaluation noted that her "[q]uality of work [wa]s improving," but her "[t]ime is still high." In terms of her scores, she received 20 "good" scores and 6 "competent" scores, with an overall performance rating of "competent."

In 2006, Travis was evaluated by four directors. Her evaluation noted that she was "getting a little better on time and technically she [wa]s performing better." However, the evaluation also noted that she made "careless mistakes, not in accounting, but in procedure matters." That year, Travis received 55 "superior" scores, 38 "good" scores, 6 "competent" scores, and 2 "marginal" scores. One director rated her overall performance "superior," two rated her overall performance "good," and one rated her overall performance "competent."

The next year, Travis's review reflected the beginning of a downward slide in her scores. Four directors rated Travis in the 2007 review; one director rated her overall performance "good" and the other three rated her performance "competent." Of the 102 specific category scores, just 2 were "superior," 49 were "good," 46 were "competent," and 5 were "marginal." The directors' comments reflected some ambivalence about her performance. Some were quite favorable, e.g., "Has done a great job with [a particular client's] account" and "Carol is very good to work with and does

dependable acctg work." Others reflected serious concerns: "Limited expertise"; "Seems like she spends too much time"; and "Could have been marginal. Not strong in accounting." Finally, some conveyed a mixture of favorable reviews shaded by specific concerns: "May need to look at the whole picture more carefully, but otherwise does good work" and "Carol does good work but I feel the need to review a bit closer than with some other GS folks."

In 2008, Travis's scores continued to dip. She was rated that year by two directors, both of whom ranked her overall performance "competent." As for the specific categories, Travis received no "superior" or "good" ratings, 48 "competent" ratings, and 4 "marginal" ratings. The directors' comments largely reflected areas of concern the directors had about Travis's performance, including that she needed to "improve her communication skills with clients," needed "heavy guidance" as to accounting theory, tended to avoid working on complicated or complex matters, and was "inefficient" with her time. Nevertheless, the comments were not all bad: one noted that she had gotten better at cost-effectively spending time on her engagements and another noted that she did "adequate" work.

In 2009, Travis was rated by five directors. Of the five, one rated her overall performance "good," while the other four rated her overall performance "competent." For the second year in a row, she received no "superior" scores in any category, although unlike in 2008, she did receive several "good" scores – 33 to be exact. However, the majority of her scores, 84, were "competent," in addition to 16 "marginal" ratings. The comments about Travis's performance ranged from good to bad. One director stated that "she performs her tasks well and seems to place emphasis on doing a good job for the client" and another stated that Travis had "done better" that year for the director's clients. However, other comments showed displeasure with Travis. One director noted that she did

not accept "constructive criticisms" and made "the same mistakes all the time," while another stated that she needed "to be more careful to avoid clerical errors." Other comments included that she: did "not always show[] a positive face to the client"; "[a]lways tries to fight with me if I ask her to do something"; "needs supervision and oversight"; and "seems to do less work than her peers."

Beyond the performance reviews, some directors recalled having issues with Travis between 2003 and 2009. For instance, Hayes, the General Services supervisor, recalled that Travis made errors working on a client account for director Bill Dermody. Dermody and Hayes discussed the errors with Travis, but Travis's performance did not improve and Dermody requested that she be removed from the account. Another director, Darrell Morris, recalled that Travis was consistently unable to perform certain work, even though Morris repeatedly explained to her how to do the work. Morris also recalled that Travis had excessive chargeable time, such that he was only able to bill clients for approximately ½ of her time. A third director, Jeff Calderon, recalled the he became so dissatisfied with Travis's work on his clients' accounts that he ultimately asked for Travis to be removed from working on all of his client accounts. In addition, Boyle, who was Travis's co-worker until January 2009, when she took over as supervisor, recalled that Travis "struggled" with parts of her job and Boyle had to give Travis help. Outside of the yearly performance reviews, none of the issues with Travis's performance between 2003 and 2009 were documented in any way.

In January 2010, Travis contacted Ruth Broom, a Human Resources Administrator at DMLO, to request FMLA leave from February 17 to March 15, 2010 for a rotator cuff surgery. The leave was approved. Travis intended to continue working until she took that FMLA leave.

However, on February 2, 2010, Travis awoke in back pain. She was unable to walk without assistance. According to Travis, she called Boyle, by then the supervisor of the General Services

Department, and said she could not come to work because she was in extreme pain. Boyle responded, "[I]t's tax season. We have lots of work to do." Travis recalled that Boyle's tone of voice was offensive.

Travis was diagnosed with a compressed sciatic nerve. She postponed her rotator cuff surgery and scheduled a back surgery for February 14, 2010. Broom helped Travis arrange FMLA leave for her back surgery and recovery. For her back issue, Travis was off work from February 2 – the day she called into work and spoke to Boyle – until March 29, 2010.

After returning from that FMLA leave, Travis worked until April 11, 2010. Then, beginning April 12, 2010 and continuing to May 10, 2010, Travis again took FMLA leave, this time for the rotator cuff surgery she had previously postponed. Around the time Travis was to return to work, she spoke to Boyle and informed her that she would be working with a sling on her arm. Boyle stated that she did not understand how Travis could work while wearing a sling. Travis did return to work with her arm in a sling, but only for a brief period of time.

When she returned to work, Travis was employed in the same position she had been in before taking FMLA leave. However, upon her return, Travis noticed that Boyle had become rude and hostile toward her, particularly in her tone of voice. Travis recalled that Hayes had commented to Travis about Boyle's rudeness toward Travis.

On June 16, 2010, Boyle had an "informal meeting" with Travis. Boyle states that the meeting was precipitated by "the volume of errors" from Travis. The errors included an accounting error that director Richard Peterson had e-mailed Boyle about in early April, as well as other errors in Travis's work that Boyle had noticed. According to Boyle, the point of the meeting was to help Travis improve her work performance. At the meeting, Boyle handed Travis a document listing

errors Travis had made with some suggestions for improvement. Travis recalled that she asked Boyle if the document was a "reprimand" and Boyle responded affirmatively. Travis admitted that she had made some of the errors listed in the document. However, she indicated that she would not learn to do PowerPoint presentations, as Boyle suggested, because Travis believed it would be too costly to train her when other employees at DMLO could do that work. Boyle requested that Travis sign the document, but Travis refused.[1]

Travis asked Broom, the Human Resources Administrator, if the document containing the list of errors and suggestions for improvement had been placed in her personnel file, and Broom confirmed that it was. Travis then prepared a written response to be placed in her personnel file. In her written response, Travis stated that she had told Boyle during the meeting that she "perceived a change in [Boyle's] attitude towards her." Travis continued that she thought the change in attitude was precipitated by Travis having taken FMLA leave during tax season. As evidence for her belief, Travis noted Boyle's statement during the February 2, 2010 phone call that it was tax season and there was a lot of work to do. Travis also noted her concern about a comment Boyle made prior to Boyle becoming supervisor that "GS should hire younger employees." Additionally, Travis included in her written response an item-by-item rebuttal of the alleged errors identified by Boyle.

On August 27, 2010, Peterson asked that Travis be removed from a client account. Peterson filled out an evaluation explaining his reason for the request. Specifically, he noted the number of errors Travis made on the account, as well as her inability to communicate with the client effectively. On August 30, 2010, Peterson and Travis met and discussed Peterson's decision.

---

[1] Boyle also had a meeting with another employee that same day. According to Boyle, the other employee took the meeting well and the employee's performance improved.

On September 29, 2010, Travis had her yearly performance review. The review was in large part highly critical of her performance. Out of the five directors that reviewed her work, one rated her overall performance "good," two rated it "marginal," and another two rated it "unacceptable." In individual category scores, she received 0 "superior" scores, 12 "good" scores, 39 "competent" scores, 36 "marginal" scores, and 33 "unacceptable" scores. The comments were also quite critical of Travis's work. For example, one comment stated, "Never was easy to work with. Work is very messy and inaccurate. Carol cannot take constructive criticism. Asked and was granted to have her removed from all of my accounts." Another stated, "Carol's work product is not getting better. The work usually is full of errors, she has a difficult personality to work with and is rude to clients." She was also called "lazy," "resentful of supervision," and "easily flustered," and was said to "have difficulty with simple accounting theory" and to make repetitive errors that "show that she either does not check her work or doesn't understand what she is doing."

At her review meeting on September 29, Travis was also presented with a copy of a written Performance Improvement Plan ("PIP"). The PIP noted that Travis's work was "consistently inaccurate or incomplete" and that, due to requests by either clients or directors at DMLO, Travis had to be removed from certain client accounts. The PIP called for Travis to receive no new client assignments for four months, at which time there would be a review of her work. The PIP also noted that the consequences of unsatisfactory improvement included "disciplinary action, up to and including discharge." During the meeting, Travis expressed surprise at the negative review and PIP, stating that she had never before had a bad review and rhetorically asking how she "could go stupid in one year."

On February 16, 2011, Travis met with Boyle and another director, Sara Gould. Boyle and Gould told Travis that her errors had not decreased, and, in fact, had gone up during the most recent quarter. Travis disputed that her errors had increased. Boyle and Gould also brought up Travis's nonchargeable time, which Boyle and Gould felt was excessive. At the end of the meeting, Boyle and Gould informed Travis that she would continue to be working under probation.

On April 28, 2011, Travis's employment was terminated for "substandard work performance including, [sic] inaccurate work, excessive time spent on projects, not following department procedures, and excessive non-chargeable time." At the time, Travis was 71 years old. According to Boyle, she had no input into the decision to fire Travis, other than the fact that she had documented Travis's errors. The decision to terminate Travis's employment was apparently made by the Board of Directors on the day before Travis was fired; Boyle states that she was unaware the Board of Directors was voting on whether to terminate Travis's employment until after the Board of Directors had made its decision.

## II.

To prevail on a motion for summary judgment, the movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine issue of material fact arises when there is sufficient evidence on which a jury could reasonably find for the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1985). The disputed issue need not be resolved conclusively in favor of the non-moving party, but that party must present sufficient probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial. *First Nat'l Bank of Ariz. v. Cities*

*Serv. Co.*, 391 U.S. 253, 288-289 (1968). Finally, the evidence must be construed in the light most favorable to the non-moving party. *Summers v. Leis*, 368 F.3d 881, 885 (6th Cir. 2004).

### III.

**A. The FMLA Claim**

The FMLA entitles eligible employees to 12 workweeks of leave during any 12-month period because of, *inter alia*, "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). "There are two recovery theories available under the FMLA: the interference theory, pursuant to 29 U.S.C. § 2615(a)(1), and the retaliation theory, pursuant to 29 U.S.C. § 2615(a)(2)." *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 446 (6th Cir. 2007) (citing *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 507 (6th Cir. 2006)). Here, Travis claims that she was retaliated against for taking FMLA leave in violation of section 2615(a)(2).

The burden-shifting framework in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) is applied to claims of FMLA retaliation. *Edgar*, 443 F.3d at 508. To make out a prima facie case, Travis must show that (1) she exercised her protected right to take FMLA leave, (2) she suffered an adverse employment action, and (3) there was a causal connection between the exercise of Travis's rights and the adverse employment action. *Id.* At the prima facie stage, the burden of proof is minimal, requiring only that the plaintiff "'put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity.'" *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 283 (6th Cir. 2012) (quoting *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007)). If Travis makes the requisite showing, the burden shifts to DMLO to proffer a legitimate, nondiscriminatory rationale for having discharged Travis.

*Id.* Finally, if DMLO proffers such a reason, then the burden shifts back to Travis to demonstrate that the given reason was a pretext for unlawful discrimination. *McDonnell Douglas*, 411 U.S. at 804-805.

DMLO argues that Travis cannot establish a prima facie case of discrimination because she cannot show a causal connection between her exercise of FMLA rights and the adverse employment action she suffered, i.e., her termination. To establish causation, Travis must "produce sufficient evidence from which an inference could be drawn" that she would not have been terminated had she not taken FMLA leave. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000).

The evidence is insufficient to allow for an inference that Travis's employment was terminated because she took FMLA leave. Initially, there was a large amount of time – nearly one year – between when Travis returned from her FMLA leave and when she was fired. It is true, as Travis points out, that "a mere lapse of time between the protected activity and the adverse employment action does not inevitably foreclose a finding of causality." *Dixon*, 481 F.3d at 335. But it is also true that lack of temporal proximity may "undermine" an inference of causation, at least barring some explanation for the lack of immediacy. *Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 149 (6th Cir. 2007); *see Dixon*, 481 F.3d at 335 (stating that the lack of immediacy does not disprove causation "'[w]hen there may be valid reasons why the adverse employment action was not taken immediately'" (quoting *Porter v. California Dep't of Corr.*, 419 F.3d 885, 895 (9th Cir. 2005))).

In this case, after Travis returned from FMLA leave, DMLO repeatedly gave Travis chances to improve her performance. First, in June of 2010, Boyle arranged an informal meeting with Travis to discuss Travis's poor performance. Boyle made a detailed list of Travis's performance issues with

suggestions for improvement and discussed with Travis. Then, two months later, Peterson discussed with Travis his decision to have her removed from his client's account. One month after that, Travis had her annual performance review, in which five different directors rated her performance, only one of which thought she performed any better than marginally. Nevertheless, despite that she had already been given an informal meeting to discuss performance issues and spoke with Peterson concerning his issues with her performance, Travis was not fired due to that negative annual review. Instead, she was given another chance to improve her performance when she was placed on the four-month PIP. Moreover, although Boyle and Gould found that Travis's performance had not improved over the ensuing four months, Travis was still not fired until over two months after she had met with Boyle and Gould. It is clear from the repeated chances DMLO gave to Travis that DMLO was actively attempting to *not* fire her. It makes no sense whatsoever that DMLO would wait for one year to fire Travis for taking FMLA leave while repeatedly taking the time to explain her poor performance to her and then giving her opportunities to improve her performance.

Travis suggests that DMLO was using the year between Travis's return from FMLA leave and her firing to "paper" the file and substantiate her termination. But given the undisputed evidence before the court, Travis's conjecture as to why DMLO waited almost an entire year before firing her for taking FMLA leave is implausible, to say the least. After all, Travis's pre-FMLA leave annual reviews hardly displayed Travis's excellence as a worker. For instance, in the three annual reviews immediately preceding her FMLA leave, Travis's overall performance was mostly deemed "competent" and the comments about her performance showed some serious concerns about her ability to do the work. To be sure, she did receive a couple of overall performance scores of "good" and also had some comments that were favorable in those pre-FMLA leave annual reviews, but, for

the most part, her performance during the three years preceding her FMLA leave could be called adequate at best. Moreover, various directors recalled having some substantial issues with Travis's work even before she took FMLA leave; indeed, two directors asked for Travis to be removed from one or more of their clients' accounts because of concern about her performance. In short, Travis's pre-FMLA leave performance was not the sort of performance that would make it unusual for an employee to be let go.

Additionally, the post-FMLA events also undermine the conclusion that DMLO was simply trying to "paper" her file so as to make it plausible to fire Travis. Had DMLO been seeking to fire Travis due to FMLA leave, it would not have repeatedly given her second chances. In other words, had DMLO solely been giving Travis poor reviews to cover up her eventual firing for taking FMLA leave, DMLO certainly would not have, for instance, given Travis a four-month period after her annual review within which to improve her performance. Simply put, the record makes implausible the contention that DMLO waited an entire year to fire Travis simply to "paper" her file.

Travis also suggests that perhaps DMLO waited so long to fire Travis because it was attempting to "eke" one more tax season out of Travis. Beyond being pure speculation, the idea that DMLO kept Travis around to work more is at odds with her contention that DMLO wanted to fire her for having taken FMLA leave well in the past.

In addition to the lack of immediacy between Travis's FMLA leave and her firing, the record does not contain any other evidence that would be sufficient to allow for the inference of a causal connection between Travis's FMLA leave and her firing. Travis makes much of Boyle's comment, "[I]t's tax season. We have lots of work to do." But Boyle made that comment in response to Travis calling in sick one day, before she or Travis knew that Travis would be taking FMLA leave. The

court cannot see any animus on Boyle's part toward Travis's taking of FMLA leave in a comment that made without knowledge that Travis would have to take FMLA leave. And Travis's perception of Boyle's attitude upon Travis's return from FMLA leave is simply insufficient to create any inference of causation. For one thing, Travis could not explain Boyle's change in attitude in any way other than stating that Boyle used a rude or hostile tone of voice toward her. More importantly, there is no evidence that would connect Boyle's perceived rudeness to Travis having taken FMLA leave.

Simply put, nothing in the record suggests that Travis would not have been fired had she not taken FMLA leave. Indeed, there is nothing in the record to suggest that any DMLO employee or director ever made any comment or took any action displaying displeasure with those employees who took FMLA leave. To the contrary, DMLO, through Broom, was apparently quite accommodating in arranging Travis's needed FMLA leave. It is pure speculation on Travis's part that anybody at DMLO harbored ill will towards her because she took such FMLA leave. Thus, she cannot establish the causation element of a prima facie case, and DMLO is entitled to summary judgment on the FMLA claim.

For many of the same reasons that rendered Travis unable to prove the causation element of a prima facie case, Travis would be unable to show that DMLO's legitimate reason for firing Travis – her well-documented history of performance issues and her inability to improve despite being given several chances – was merely a pretext. To show pretext, Travis must show that an employer's legitimate, non-discriminatory reason for an adverse employment action "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003).

There can be no doubt that Travis's performance issues had a basis in fact. Her poor performance was repeatedly documented in the year between her FMLA leave and her termination. Indeed, as noted above, even before she took FMLA leave, Travis's performance was steadily dipping, rather than improving. Nor is there any doubt that Travis's poor performance was sufficient to warrant termination. Finally, in light of the length of time between her FMLA leave and her firing, the repeated opportunities that DMLO gave to Travis to improve her performance, and the lack of evidence that anybody at DMLO had any issue with employees taking FMLA leave, there is no basis for finding that Travis's poor performance was not the actual motivation for her firing.

**B. The ADEA and KCRA Claims**

In Counts II and III of the complaint, Travis brings age discrimination claims under the ADEA and KCRA. In its summary judgment motion, DMLO argues that Travis cannot prove her claims of age discrimination because she cannot establish a prima facie case of age discrimination or prove pretext. DMLO further argues that Travis could not show a prima facie case of retaliation for opposing age discrimination because Travis did not engage in any protected activity to oppose age discrimination at DMLO. Travis did not respond to DMLO's summary judgment arguments as to those claims.

It appears that there are no genuine disputes as to any material facts relating to the ADEA and KCRA claims in Counts II and III and summary judgment in DMLO's favor on those counts is warranted. Travis concedes as much by declining to make any legal arguments as to why those claims should not be dismissed. As Travis has abandoned the ADEA and KCRA claims, the court will grant summary judgment to DMLO on Counts II and III of the complaint. *See Larimore v. Grant*, 2006 WL2037390, at *1 n.3 (W.D.Ky. July 17, 2006) ("There is neither evidence nor

There can be no doubt that Travis's performance issues had a basis in fact. Her poor performance was repeatedly documented in the year between her FMLA leave and her termination. Indeed, as noted above, even before she took FMLA leave, Travis's performance was steadily dipping, rather than improving. Nor is there any doubt that Travis's poor performance was sufficient to warrant termination. Finally, in light of the length of time between her FMLA leave and her firing, the repeated opportunities that DMLO gave to Travis to improve her performance, and the lack of evidence that anybody at DMLO had any issue with employees taking FMLA leave, there is no basis for finding that Travis's poor performance was not the actual motivation for her firing.

**B. The ADEA and KCRA Claims**

In Counts II and III of the complaint, Travis brings age discrimination claims under the ADEA and KCRA. In its summary judgment motion, DMLO argues that Travis cannot prove her claims of age discrimination because she cannot establish a prima facie case of age discrimination or prove pretext. DMLO further argues that Travis could not show a prima facie case of retaliation for opposing age discrimination because Travis did not engage in any protected activity to oppose age discrimination at DMLO. Travis did not respond to DMLO's summary judgment arguments as to those claims.

It appears that there are no genuine disputes as to any material facts relating to the ADEA and KCRA claims in Counts II and III and summary judgment in DMLO's favor on those counts is warranted. Travis concedes as much by declining to make any legal arguments as to why those claims should not be dismissed. As Travis has abandoned the ADEA and KCRA claims, the court will grant summary judgment to DMLO on Counts II and III of the complaint. *See Larimore v. Grant*, 2006 WL2037390, at *1 n.3 (W.D.Ky. July 17, 2006) ("There is neither evidence nor

argument offered in Larimore's response to the motion for summary judgment to support the 'insider trading' allegations in Count III. The court presumes, therefore, that this portion of the claims has now been abandoned.").

## IV.

In sum, the court will grant DMLO's motion for summary judgment and dismiss this action with prejudice. A separate order will issue in accordance with this opinion.

July 15, 2013

**Charles R. Simpson III, Senior Judge**
**United States District Court**